## Achenbach v. Montgomery

C.P. of Berks County, no. 06-11309.

*Mary C. Favinger,* for plaintiff.
*Dawn M.L. Palange,* for defendant.

LASH, *J.,* August 25, 2010—The matter before this court is the petition of plaintiff, Dana G. Achenbach, to modify the child custody order entered by this court on April 16, 2007. Trial was held on August 20, 2010. The court enters the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Dana G. Achenbach (Father), is an adult individual who currently resides at 1652 Prospect Drive, Chesapeake, Virginia 23322.

(2) Defendant, Dianne E. Montgomery (Mother), is an adult individual who currently resides at 243 South State Street, Hamburg, Berks County, Pennsylvania 19526.

(3) The parties are the natural parents of a minor child, Kolby D. Arndt-Montgomery, born July 25, 1997 (minor child).

(4) The parties were never married nor ever resided together.

(5) Mother has always been the primary custodian of the minor child.

(6) Mother has had several relationships since the birth of the minor child, first with her first husband, Ryan Hartman, then with her second husband, Joseph Narvaez,

and currently with her boyfriend, Chad Austerberry. Mother and her current boyfriend have an infant daughter, Kally, born July 1, 2010.

(7) Mother began living with Ryan Hartman some time in 2000, getting married in 2004. They were divorced one year later in 2005. She met Mr. Narvaez in late 2005 or early 2006 and they eventually married. They separated in August 2008. In April of 2009, Mother obtained an emergency protection from abuse order on Mr. Narvaez when he broke into her home. A divorce action is pending. She has resided with her current paramour, Chad Austerberry, since April of 2009.

(8) The within action was initially commenced by Father on September 26, 2006 seeking partial custody. A temporary order was entered on January 17, 2007, providing, among other things, that the parties would share legal custody, with Mother to have primary physical custody, with no specific provisions for partial custody awarded to Father. At that time, Father had had no contact with the minor child. The temporary custody order provided that the parties and minor child would consult with a counselor to determine "whether an introduction between Father and the child is in the child's best interest and if so, how such introduction should take place."

(9) After counseling was performed, the parties reached an agreement, which was entered as an order of court on April 16, 2007, providing, among other things, that the parties would share legal custody, that Mother would have primary physical custody, with Father to have partial physical custody during the school year every third weekend from Friday at 7 p.m. until Sunday

at 5 p.m., with an extension until Monday at 5 p.m., if the minor child did not have school on the Monday after Father's weekend. During the summer, Father would have partial custody for one week in the month of June, two weeks in July, and one week in August. To exchange the minor child, the parties agreed to meet in Dover, Delaware.

(10) Father filed the within petition on November 14, 2008, requesting primary custody of the minor child. Father averred that his household was stable and that Mother's was unstable in that she had been through several relationships, and that Mother was being evicted from her residence. Further, Mother's second husband, Joseph Narvaez, was accused of assaulting Mother and was arrested for indecent exposure. Father also alleged that Mother is failing to sufficiently address the minor child's ongoing medical needs.

(11) Father currently resides with his wife, Nicole, the couple's son, Dakota, born September 12, 2001, and daughter, Ava, born November 22, 2009.

(12) Mother currently resides with Chad Austerberry, their infant daughter, Kally, and the subject minor child.

(13) Father resides in the Chesapeake School District, Chesapeake, Virginia. Mother resides in the Hamburg School District, Hamburg, Berks County, Pennsylvania 19526.

(14) The parties' residences are approximately six to six and one-half hours apart.

(15) Father is self-employed in his business known as "Custom Home Improvement & Repairs of Hampton Roads" located in Virginia Beach, Virginia. His sched-

uled work hours are Monday through Thursday from 9 a.m. to 5 p.m., Friday from 9 a.m. to 1 p.m., and Saturday from 9 a.m. to 1 p.m., but the hours are sometimes expanded to accommodate clients.

(16) Mother is currently employed at McCann's School of Business and Technology, working there since November of 2008. She works Monday through Friday from 9 a.m. to 5 p.m. and some Saturdays.

(17) In accordance with this court's order, the parties submitted to an independent psychological evaluation, performed by Alison L. Hill Ph.D., of Berks Counseling Associates P.C. Dr. Hill conducted clinical interviews of the parties, the minor child, Father's wife and his other son. Dr. Hill also administered the Minnesota multiphasic personality inventory-2 (MMPI-2), the parent awareness skills survey (PASS), and a parent questionnaire. The evaluations took place over a two-month period from April of 2009 to June of 2009. A written report was submitted. Dr. Hill then updated her report with an additional clinical evaluation performed on April 27, 2010, providing a written report in May 2010.

## II. DISCUSSION

In making disposition, this court considered the testimony of the parties, Father's wife, Nicole, the minor child's school guidance counselor, Deborah Reilly, an in camera conference with the minor child, the independent evaluation performed by Dr. Hill, a stipulation on the testimony of the maternal grandmother, and the exhibits of the parties.

Father's decision to seek primary custody is somewhat unusual, considering he had no quality contact with the

minor child until 2006. He states he was unaware the minor child could be his until the minor child was approximately 3 years old, when the maternal grandmother instituted adoption proceedings. At that time, Father submitted to a paternity test which determined that he was the father. The adoption proceedings were never completed, but according to Father, he was not made aware of this and assumed that his rights had been terminated. In 2006, Mother filed for child support and it was at that time that Father first learned that he continued to have duties as a parent. Since that time, he has endeavored to spend as much time with the minor child as possible, in the hope of developing a relationship. As stated, there was a preliminary counseling period designed to help Father and the minor child start off on the right foot, and to help the minor child cope with the idea that his natural Father intends to become involved in his life. Shortly thereafter, the current order was entered, granting Father partial custody.

For a time, Father was satisfied with his role as a partial custodian, seeing the minor child every third weekend and for a few weeks during the summer. However, Father became aware of circumstances which caused him to question whether Mother was properly protecting the welfare of the minor child. According to Father, the maternal grandmother advised him that Mother was being physically assaulted by her fiancé, Joseph Narvaez. Father began investigating and determined that Mr. Narvaez had been charged with indecent exposure and had other criminal involvement. Father then became aware that Mother married Mr. Narvaez within a few weeks after he was charged with the indecent exposure. He also was concerned with the minor child's grades,

with the fact that Mother did not have contact with the school, and apparently was not properly supervising the minor child's academics. She was also failing to properly address a bowel obstruction condition in which the minor child suffered. Father was also having difficulty obtaining his visits and found Mother to be difficult. Accordingly, he filed the within petition.

Father represents that he has a great deal to offer the minor child. He emphasizes his family, career, and household stability. He has a strong marriage with his wife of nine years and two children by that marriage. He owns his home, which is a second residence, deciding to move to this location because of his preference for the Chesapeake School District. He owns his own business. He and his wife have post-secondary educations, which he believes would assist him and his wife to aid the minor child in his schooling. He also believes he is very active with all his children, willing to participate with them in sports and other recreation. He emphasizes consistent and appropriate discipline, such as sending the minor child to his room, or restricting the minor child from videogames or other recreation. For example, when the minor child disobeyed Father's rule that the minor child could not text message after 11p.m., Father took the cell phone from the minor child for two days.

Father contrasts his parenting skills with those of Mother's, which he categorizes as being substantially deficient. Mother lacks stability, having been involved in at least three relationships and being married twice. As stated, Mother's second husband was involved in criminal conduct and abusive toward Mother. At one point, the minor child contacted Father, being very upset about Mother's second husband's assaultive nature.

Mother frequently moves. Generally, she remains within the Hamburg School District, although for a time, she resided with the maternal grandparents in Leesport in the Schuylkill Valley School District, although Mother continued to send the minor child to the Hamburg School District. Father suspects that the minor child has actually resided with the maternal grandparents for substantial periods of time, even while Mother was residing elsewhere. He also believes that the minor child is closer to the maternal grandmother than he is to Mother.

Father believes that Mother does not properly attend to the minor child's needs. She has no contact with the school district and even has failed to provide them with an updated address. Regarding the medical condition, it was the maternal grandmother who first took the minor child to seek medical treatment. Approximately a year later, Mother took the minor child for medical treatment for the same bowel obstruction condition, advising the physician that the minor child had not previously been treated. Apparently, Mother was either unaware of the minor child's condition or did nothing to counteract the problem.

Father is concerned that the minor child is beginning to get involved in criminal activity or abuse of drugs. Father has reviewed the minor child's text messages, which includes conversations about using marijuana, and about hiding from police, also including other inappropriate comments.

Father believes that Mother is unable to discipline the minor child. He also believes the maternal grandmother is indulgent, resulting in the minor child having little or no structure.

The minor child has failed the seventh grade and will have to repeat. Due to the minor child's recent record, including tardiness, failure to complete assignments, and plummeting grades, the school district intervened and attempted to determine the problem. There was concern that there could be emotional or substance abuse problems. Mother did not participate or even approve any testing for these problems. Additionally, the minor child has peers who, according to the school guidance counselor, have themselves gotten into trouble and are a bad influence. Father believed that Mother's inability to supervise the minor child has created his problems at school.

Father states that Mother has denied him his scheduled visits and has been difficult in working with the schedule. She is also inflexible, refusing to accommodate special requests that Father makes. For instance, on one occasion, Father wanted to have time with the minor child for a special event, which was occurring at a time when Mother would normally have custody. Mother advised Father that a change would also work better for her schedule, however, she refused to agree to the change, stating that the parties must follow the terms of the order.

Mother wants to retain primary physical custody. She has been the sole caretaker for the minor child since the minor child's birth. She believes she has a strong bond with the minor child. The minor child also has a close relationship with the maternal grandmother and had also had a wonderful relationship with the maternal grandfather until his unfortunate passing. Further, the minor child has an ongoing paternal relationship with Mother's first husband, Ryan Hartman. Mr. Hartman continues to see

the minor child, and the minor child has spent time at Mr. Hartman's home and vacationing with him.

Mother disputes some of Father's testimony. She contends that Father had known about the existence of the minor child for some time prior to 2006, and even before the adoption proceedings. She wonders why he did not become involved prior to the institution of support proceedings, and argues that avoiding support is a motivation.

Mother contends that Father has made disparaging comments about Mother to the minor child, attempting to convince the minor child of the validity of his position. Father compiled notes in a black notebook, containing issues Father had with Mother's care of the minor child over the years. He permitted the minor child to have access to this notebook, which he admits was a lapse judgment on his part. He also gave the minor child a cell phone, which, unknown to Mother, had a tracking system to enable Father to know when the minor child was not at Mother's home.

Mother denies that she is posing obstacles to Father seeing the minor child. She states that she believes it is proper for Father to have a relationship with the minor child and makes every effort to assist. However, she has a great deal of difficulty with the minor child who does not want to travel to Father's house and who will plead and cry to keep from having to visit Father. Mother takes the position that she cannot force the minor child to see Father. She also contends that Father has been inconsistent in his requests for the minor child, sometimes not asking to see him for weeks at a time. She also does set rules and imposes appropriate discipline, contrary to

Father's implications that she and the maternal grand-mother spoil the minor child.

Mother disputes Father's categorization of her handling of the minor child's medical problems. She states that she has properly cared for the minor child. On one occasion, she accompanied him to Children's Hospital to attempt to remedy the problem.

Mother concedes that the minor child has had difficulties in school, however, these are of recent origin. The minor child is intelligent and quite adept at understanding the curriculum. However, he is somewhat lazy in performing projects. Contrary to Father's assertion, Mother has had contact with the school on these issues, testifying that she and the school district agreed to an "action plan" whereby the minor child would stay for hour after school with the school principal to ensure that his homework would be done before he left the school. Unfortunately, this plan did not work, and the minor child is being required to repeat the seventh grade. As far as peers, Mother does not believe that most of the minor child's friends are a problem. She has had some difficulties with a couple of the children. There are other children, cited by the school, who are not known to her. She denies that the minor child has any criminal involvement or is abusing drugs.

Mother does admit moving several times during the life of the minor child. Initially, she resided with the maternal grandparents, then she began living with Ryan Hartman. When they separated, she moved back in with her parents for a short time until she could find an apartment. She then moved in with her second husband, Mr. Narvaez. When they separated, she again returned to the

maternal grandparents' home until she could find another place. She denies turning custody of the minor child over to the maternal grandmother at any time, however.

In essence, Mother believes that the minor child's interests would not be served with Father. She has been the primary custodian and can continue to do so. The minor child has no interest in residing with Father. In fact, Mother raised the possibility that the minor child's plummeting grades were a direct result of Father filing this petition, the two were close in timing. The minor child would miss his friends and his family, particular, the maternal grandmother. When he is with Father, he is constantly contacting his family and friends by text messages and telephone.

Dr. Hill provided some helpful insight. Regarding Father, she states that Father has established himself as a positive male role model and positive influence in the minor child's life. Although limited by the years he missed with the minor child and by the distance between residences, Dr. Hill finds Father to have " accepted the circumstances in a very positive and forthright manner," being assertive in attempting to maintain regular contact with the minor child. Dr. Hill finds that a positive bond has developed between Father and the minor Child. He would provide a good family atmosphere, consistency, and flexibility in his schedule to enable him to spend quality time with the minor child. He is currently invested in the minor child and concerned about his well-being.

Father spoke to Dr. Hill of the minor child's deteriorating behavior, productivity at school, and the fact that he appears willing to "give up easily." Father has made

contact with the school district where he resides, in the event that the minor child is permitted to relocate. Dr. Hill also found Father's wife to be an excellent influence for the minor child.

Regarding Mother, Dr. Hill finds her to be more of a "part-time parent," believing that most of the parenting has been done by the maternal grandparents and now the maternal grandmother. Mother was found to display "inconsistent parenting and discipline skills" and a "minimal understanding of child developmental issues." Dr. Hill primarily blames Mother for the estrangement between Father and the minor child and believes she continues to interfere with their relationship. In sum, Dr. Hill states: "There is no doubt that [Mother] cares about the [minor child], but it appears that she has been more concerned about her own life all along than she has about [the minor child] and focusing on meeting his needs and what would be best for him."

Dr. Hill recommends that Father have primary physical custody, with Mother to have partial physical custody every third weekend and additional time during school vacations, in essence, a reversal of the current schedule. Dr. Hill also recommends counseling and also warns the parents to keep the minor child from being involved in the discussions about him or in giving him the freedom to choose how the custody schedule and transitions will take place.

Dr. Hill's updated evaluation provided her analysis on matters that occurred since she last saw the parties, the most important being the death of the maternal grandfather. She noted that the minor child wants to remain in Hamburg to continue to attend his school and be with

his friends and also noted a level of estrangement between he and Father. Clearly, the custody action and the death of the maternal grandfather have exacerbated the stress in the minor child's life. She continues to recommend that Father have primary custody, emphasizing that individual counseling for the minor child is important and that it is also important that the custody matter be resolved as soon as possible.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

This is an unfortunate situation where the minor child presents several of the symptoms attributable to an "at risk youth." He clearly lacks interest in school, desiring only to "hang out" with his friends. The friends he has, including several females, talk about adult matters, substance abuse, and criminal activity. Whether the minor child is actually involved in any of these activities or is merely "talking big," he nevertheless has his mind in the wrong place.

The minor child's problems stem in large part due to the lack of participation from both parents, albeit from different circumstances. In Father's case, his participation did not begin until 2006, when the minor child was 8 or 9 years old. Dr. Hill blames Mother for this but, in real-

ity, it appears that both parents can share the blame. Mother perceived that Father did not want to become involved and therefore, she did not want him to be involved, at least until she needed money for support. For his part, Father likely suspected that he was the Father of the minor child, initially taking on a "don't ask, don't tell" position. We also note that when his paternity was established, he did not immediately seek time with the minor child, agreeing instead that the adoption could be processed. We also note that Mother's involvement as primary caretaker was insubstantial, although she was not quite the minimalist Father would suggest.

Fortunately, Father's perspective has changed. Since 2006, he appears to have made every effort to be a Father to this minor child and to invest his time and effort in his well-being. Father has been handicapped by the estrangement of the first eight years, the distance between the residences, and Mother's reluctance, as well as her inability to maintain authority over the minor child. Father has nevertheless persevered, continuing to plug along to maximize his relationship with the minor child and the minor child's well-being.

Currently, Father provides a very attractive environment. He does have a stable household with two other children. His wife has an excellent perspective and desire to be a stepmother to the minor child and will be a good influence for him. Father appears to be "hands on," willing to commit his time and resources to educational assistance and recreational activities, even providing him with some vocational training in his job while the minor child was visiting him during the summer. What was lacking in the minor child's life up to this point, stabil-

ity, structure, discipline, and consistency, can now be provided.

We believe that Mother loves the minor child a great deal and wants the best for him. However, she has not been willing to this point to do the difficult things required of a parent, such as discipline, supervising his curriculum, and requiring him to do things he doesn't want to do. If he remains at Mother's house, a lot of the decisions he makes will be his own decisions, which friends he spends time with, what commitment he makes to school, and whether he continues to dabble in the counterculture in which he appears to be interested.

It is significant that neither Mother's current paramour, nor Mr. Hartman, with whom the minor child has a good relationship, came to court to speak up on behalf of her as a mother. It is also significant that both Dr. Hill and the school district pronounced that a fresh start would apparently be what is best for this minor child.

That being said, we must also note that Mother was the one who accepted the role as primary custodian, not Father, whom we believe could have assumed responsibility at a much earlier juncture. If Mother had to rely on her parents for substantial assistance, that is not inappropriate. In some ways, Mother did the best she could, with limited means and opportunities. At this juncture, however, it appears best to release her from further responsibility as primary custodian and transfer that responsibility to Father.

Both parties agree that the non-custodial party should have extensive time in the summer. During the school year, rather than have every third weekend, the parties both suggested that long weekends, where the minor

child does not have school on a Monday due to a holiday or in-service day, should be the days for partial custody. Accordingly, Father shall provide Mother with the school schedule. All holidays during the school year where there is an extended weekend, including Thanksgiving, as well as any in-service days, shall be Mother's weekends. This does not include Christmas, which the parties shall split as more fully set forth in the court's order. Mother shall be entitled to six weeks during the summer. At Father's request, the transfer shall take place in Seaford, Delaware, which is approximately midway between the parties' residences.

We enter the following order:

## ORDER

And now, August 25, 2010, after trial held, custody of the parties' minor child, Kolby D. Arndt-Montgomery, born July 25, 1997, (minor child), shall be as follows:

(1) The parties shall share legal custody of the minor child.

(2) Plaintiff, Dana G. Achenbach (Father), shall have primary physical custody of the minor child.

(3) Defendant, Dianne E. Montgomery (Mother), shall have partial physical custody of the minor child as follows:

(A) During the school year, any weekend where the minor child is excused from school on the Friday before the weekend or the Monday after the weekend due to a holiday or in-service day. This shall include Thanksgiving, but shall not include Christmas;

(B) During the minor child's spring break, commencing at 1 p.m. the day following the minor child's last day of school until 1 p.m. on the day prior to the minor child's return to school;

(C) For six weeks during the summer months, the weeks to be consecutive or nonconsecutive, the times to be agreed upon by the parties, but in lieu thereof, to commence one week after the expiration of the minor child's school year; and

(D) At such other times as the parties may mutually agree.

(4) For the Christmas holiday, the parties shall alternate such that during even-numbered years, Mother shall have custody of the minor child, commencing one day after the minor child's school break begins through December 27 at 1 p.m. Father shall then have the remainder of the Christmas holiday, with the schedule to reverse on odd-numbered years.

(5) The parties shall permit the minor child to maintain a cell phone to permit him to have frequent contact with the non-custodial parent and the maternal grandmother. A webcam on the computer may also be set up, if financially feasible.

(6) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on

both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncompli-

mentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make

choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.